ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| COMITÉ DIÁLOGO AMBIENTAL<br><br>Recurrente<br><br>v.<br><br>Oficina de Gerencia de Permisos (OGPe)<br><br>Clean Flexible Energy, LLC (Parte Proponente)<br><br>Recurridos | KLRA202400334 | *Revisión Judicial de Determinación Administrativa* procedente de la Oficina de Gerencia de Permisos (OGPe) del Departamento de Desarrollo Económico (DDEC)<br><br>Número de Caso: 2023-507196-CUB-009853<br><br>Sobre: Consulta de Ubicación 2023-507196-CUB-009853<br><br>Determinación de cumplimiento ambiental para Evaluación Ambiental 2023-507196-DEA-013159 |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Rodríguez Flores.

Rodríguez Flores, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de octubre de 2024.

El 24 de junio de 2024, el Comité Diálogo Ambiental, Inc., (Comité Ambiental) instó el recurso de revisión judicial de epígrafe. Solicita que revoquemos una *Resolución* emitida el 21 de mayo de 2024, y notificada el 23 de mayo de 2024, por la Junta Adjudicativa de la Oficina de Gerencia de Permisos (OGPe) del Departamento de Desarrollo Económico y Comercio (DDEC), que aprobó la consulta de ubicación número 2023-507196-CUB-009853 para el Proyecto Salinas Solar Fase I, conforme a la recomendación del Oficial

Examinador de la OGPe y sujeto al cumplimiento de todos los requisitos de infraestructura efectuados por las agencias pertinentes.[1]

Por su parte, la OGPe presentó una *Oposición a Revisión Administrativa* el 19 de julio de 2024, y Clean Flexible Energy, LLC (Clean Flexible Energy) también radicó una *Oposición a Recurso de Revisión Judicial* el 24 de julio de 2024.

Posteriormente, el 11 de septiembre de 2024, la Autoridad de Energía Eléctrica (AEE) presentó un *Alegato de Amicus Curiae de la Autoridad de Energía Eléctrica de Puerto Rico*.

Examinados los escritos a la luz del derecho aplicable, y por los fundamentos que expondremos a continuación, confirmamos la *Resolución* recurrida y autorizamos *Alegato de Amicus Curiae de la Autoridad de Energía Eléctrica de Puerto Rico* presentado por la AEE.

**I.**

El 21 de septiembre de 2023, Clean Flexible Energy radicó una consulta de ubicación ante la OGPe bajo el caso número 2023-507196-CUB-009853 como parte del proceso de planificación del proyecto propuesto, y según requerido por el Reglamento Conjunto 2023.[2] Dicho proyecto estaría dirigido a la instalación de un sistema solar fotovoltaico con capacidad de generación de 120 megavatios (MV) de energía, un sistema de almacenamiento de 100 MV y la constitución de una servidumbre para una línea de interconexión a una subestación privada, en un terreno con una cabida de 560.56 cuerdas, con el propósito de servir como recurso de energía renovable a la red eléctrica de Puerto Rico. Particularmente, estaría localizado en las Carreteras PR-53, PR-3 y PR-706, Km 2.3, Barrio

---

[1] *Resolución*, Apéndice del recurso, págs. 265-271; *Notificación, Íd.*, págs. 272-273.

[2] *Informe de Vista Pública, Íd.*, págs. 240-241 (se toma conocimiento judicial de este hecho); Reglamento Conjunto, Reglamento Núm. 9473, Junta de Planificación, 16 de junio de 2023, 9473.pdf (gobierno.pr).

Aguirre del Municipio de Salinas; y en el Barrio Jobos del Municipio Guayama.[3]

Luego de varios trámites administrativos, el 21 de diciembre de 2023, el Comité Ambiental presentó una *Moción de Intervención y Solicitud de Vistas Públicas* dentro del trámite de la consulta de ubicación, por la cual alegó que tenía un interés ambiental y comunitario con relación al desarrollo del proyecto.[4] El 28 de diciembre de 2023, la OGPe autorizó dicha intervención.[5]

El 20 de febrero de 2024, la División de Cumplimiento Ambiental de la OGPe emitió una *Determinación de Cumplimiento Ambiental para Evaluación Ambiental* bajo el caso número 2023-507196-DEA-013159, mediante la cual aprobó el documento de evaluación ambiental del proyecto propuesto.[6]

Posteriormente, la Junta Adjudicativa de la OGPe celebró una vista pública los días 19 y 23 de abril de 2024 por medios tecnológicos, en virtud de la Regla 2.1.10 del Reglamento Conjunto 2023, respecto a la consulta de ubicación presentada por Clean Flexible Energy.[7]

El 2 de mayo de 2024, el Oficinal Examinador de la OGPe, el señor Miguel Mihaljevich, emitió un *Informe de Vista Pública*, donde incluyó determinaciones de hecho, conclusiones de derecho y recomendaciones sobre el proyecto de energía en cuestión.[8]

Se desprende de dicho informe que el terreno sobre el cual se desea realizar el proyecto está clasificado como Suelo Rústico Especialmente Protegido-Agrícola (SREP-A), según el Plan de Uso de

---

[3] *Resolución, Íd.,* pág. 265.
[4] *Moción de Intervención y Solicitud de Vistas Públicas,* Apéndice de la oposición al recurso presentada por OGPe, págs. 190-199.
[5] *Resolución sobre Solicitud de Intervención, Íd.,* págs. 200-208.
[6] *Determinación de Cumplimiento Ambiental para Evaluación Ambiental,* Apéndice del recurso, págs. 157-163.
[7] *Informe de Vista Pública, Íd.,* pág. 234 (se toma conocimiento judicial de este hecho); Reglamento Conjunto 2023, supra, págs. 33-38.
[8] *Informe de Vista Pública,* Apéndice del recurso, págs. 234-264.

Terrenos (PUT) de Puerto Rico,[9] lo cual equivale a Agrícola Productivo (A-P), según el Mapa de Calificación de Suelos del Municipio de Salinas, o Agrícola Mecanizable (A-1), conforme al Mapa de Calificación de Suelos del Municipio de Guayama. Solo una pequeña porción del terreno está clasificada como Suelo Rústico Común (SRC), y el terreno propuesto radica en una zona *no* inundable (Zona X) con excepción de dos pequeñas áreas en el sureste y sur del proyecto, las cuales radican en zona inundable (Zona A) fuera del Cauce Mayor.[10]

Sin embargo, el predio propuesto para el proyecto "no está siendo utilizado para un uso productivo por el dueño".[11] Además, el Departamento de Agricultura, a través de los miembros del Comité de Energía, no objetó al desarrollo del proyecto en dicho terreno porque entendió que era necesario establecer fuentes alternas de energía ante las fluctuaciones inestables del sistema energético de la zona sur de Puerto Rico.[12]

Mediante el informe de la vista pública, el Oficial Examinador también expresó que el proyecto reunió favorablemente los criterios de evaluación para una consulta de ubicación dado a las siguientes razones:

> a) El Proyecto Propuesto es conforme con los planes territoriales de los Municipios de Salinas, a través del Consorcio, y Guayama al calificar los terrenos como A-P, dentro de los cuales se permite el desarrollo de proyectos de energía renovable. Además, el Proyecto Propuesto viabiliza el uso dual de la propiedad para el desarrollo de propuestas agrícolas, toda vez que es posible armonizar la producción de energía renovable con usos agrícolas. Esto pues, la instalación de paneles solares sobre el terreno no representa un daño irreversible a los terrenos agrícolas.

---

[9] Junta de Planificación, "Plan de Uso de Terrenos: Guías de Ordenación del Territorio" (Plan de Uso), 19 de noviembre de 2015, pág. 124, *Memorial del Plan de Uso de Terrenos (pr.gov) (última visita, 8 de octubre de 2024).
[10] *Informe de Vista Pública*, Apéndice del recurso, pág. 237.
[11] *Íd.*, pág. 237.
[12] *Íd.*, págs. 237-238; 241.

b) La infraestructura necesaria para atender las necesidades del Proyecto existe o se puede proveer.

c) El uso del Proyecto Propuesto es viable, aceptable y conveniente. El Proyecto cuenta con el capital privado necesario para su construcción y operación; no tendrá impactos significativos al medioambiente; no impacta recursos culturales ni naturales protegidos, y considera las medidas de mitigación necesarias para su implementación.

d) El Proyecto Propuesto no requiere un cambio de calificación directo, toda vez que se presenta a tenor con las disposiciones del Capítulo 9.4.1. del Reglamento Conjunto 2023 el cual requiere que se lleve a cabo una consulta de ubicación para proyecto de energía renovable cuya capacidad sea mayor de un 1MV.

e) El Proyecto Propuesto propone acciones que atienden necesidades de la comunidad donde ubica el Proyecto Propuesto y de todo Puerto Rico ya que responde a la necesidad de crear un sistema eléctrico resiliente y robusto para la Isla.

La mayor objeción al proyecto por parte de los participantes está basada en la calificación agrícola que ostenta el predio. No obstante, el uso propuesto es uno contemplado por el Reglamento Conjunto. Igualmente, la preocupación sobre la posibilidad de inundabilidad fue atendida como parte de los propuestos la cual se deberá concretar a través del permiso de construcción que en su día se emita para la realización del proyecto presentado.

De la prueba presentada quedó establecido que la ubicación y desarrollo de la obra propuesta no presenta peligro a la salud, la seguridad de las personas o del medio ambiente pero si beneficiara a la ciudadanía en general ante una mejora en la provisión de energía requerida por ésta.

Así las cosas, el Proyecto Propuesto es cónsono con la política pública energética que tiene como eje central la diversificación de fuentes de energía renovable y promover el desarrollo económico de la Isla, la política publica ambiental y la política pública de uso de terrenos adoptadas por el Gobierno de Puerto Rico.
. . . .[13]

Luego de ello, la Junta Adjudicativa de la OGPe emitió una

*Resolución* el 21 de mayo de 2024, notificada el 23 de mayo de 2024,

---

[13] *Íd.*, págs. 261-262.

por la que aprobó la consulta de ubicación número 2023-507196-CUB-009853 para el Proyecto Salinas Solar Fase I, conforme a la recomendación del Oficial Examinador de la OGPe y sujeto al cumplimiento de todos los requisitos de infraestructura efectuados por las agencias pertinentes. Además, formó parte de dicha resolución el informe de la vista pública.

Inconforme con dicha determinación, el Comité Ambiental acudió ante esta Curia el 24 de junio de 2024, y señaló que la OGPe cometió los siguientes errores:

> **PRIMER ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL CONCLUIR ARBITRARIAMENTE QUE EL USO PROPUESTO ESTÁ CONTEMPLADO EN EL REGLAMENTO CONJUNTO Y AL NO CONSIDERAR EL IMPACTO DEL PROYECTO SOBRE TERRENOS DE ALTO VALOR AGRÍCOLA.**
>
> **SEGUNDO ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL CONSIDERAR EL IMPACTO DEL PROYECTO SOBRE LAS COMUNIDADES CERCANAS A DONDE UBICARÍA EL PROYECTO.**
>
> **TERCER ERROR: ERRÓ LA OGPE AL NO CONSIDERAR LOS IMPACTOS SIGNIFICATIVOS Y NO MITIGADOS DEL PROYECTO Y NO EXIGIR LA PRESENTACIÓN DE UNA DECLARACIÓN DE IMPACTO AMBIENTAL.**

En síntesis, alegó que la OGPe aprobó la consulta de ubicación en controversia a pesar de que la instalación de placas solares es incompatible con la clasificación SREP-A dispuesta en el Plan de Uso de Terrenos o A-P, según el Mapa de Calificación de Suelos del Municipio de Salinas, y que dicha entidad administrativa no consideró los posibles impactos al terreno, medioambiente y a la comunidad vecina. Sostuvo también que el municipio de Salinas o el Consorcio Cayey, Coamo, Villalba, Salinas no endosaron el proyecto en controversia; y que la no objeción del Departamento de Agricultura no subsanó los errores de la OGPe al autorizar un supuesto uso industrial en terrenos agrícolas. Por último, planteó que la OGPe debió haber solicitado la presentación de una declaración de impacto ambiental.

Por otro lado, la OGPe presentó una *Oposición a Revisión Administrativa* el 19 de julio de 2024. En primer lugar, reiteró las recomendaciones del Oficial Examinador. Segundo, sostuvo que no era necesaria una declaración de impacto, pues era suficiente con la presentación de una evaluación ambiental. Por último, expresó que el Departamento de Agricultura presentó una carta donde no objetó el desarrollo del proyecto en el predio porque entendió que era necesario establecer fuentes alternas de energía ante las fluctuaciones inestables del sistema energético de la zona sur de Puerto Rico; y enfatizó que la actividad agrícola no se vería impactada.

Clean Flexible Energy radicó una *Oposición a Recurso de Revisión Judicial* el 24 de julio de 2024. En síntesis, alegó que el uso del proyecto de energía renovable es permitido dentro del distrito A-P, y que las agencias concernidas evaluaron el impacto sobre los terrenos agrícolas y concluyeron que no era significativo. Sostuvo también que el Departamento de Agricultura endosó el proyecto por lo cual dicha determinación merece deferencia, y no era necesaria la preparación de una declaración de impacto ambiental ante la ausencia de un impacto significativo y la presentación de una evaluación ambiental.

El 11 de septiembre de 2024, la AEE presentó una *Moción para Comparecer como Amicus Curiae* y un *Alegato de Amicus Curiae de la Autoridad de Energía Eléctrica de Puerto Rico*. Mediante el alegato, la AEE indicó que el proyecto de Clean Flexible Energy adelantaría significativamente la política pública energética de Puerto Rico establecida mediante la *Ley de Política Pública de Diversificación Energética por medio de la Energía Renovable Sostenible y Alterna en Puerto Rico*, Ley Núm. 82 del 19 de julio de

2010 (Ley 82-2010), según enmendada.[14] Sostuvo que esta ley requiere que la AEE, el único proveedor de energía eléctrica en Puerto Rico, distribuya el 40% de energía renovable para el año 2025. Indicó también que luego de publicar solicitudes de propuestas para cumplir con lo anterior, Clean Flexible Energy presentó la suya, la cual constituiría un 21% de la capacidad total de generación de energía y almacenamiento en baterías bajo el primer tramo de proyectos de energía renovable.

Por último, Clean Flexible Energy presentó una *Urgente Moción en Auxilio de Jurisdicción* el 17 de septiembre de 2024 por la cual solicitó que se adjudicara el recurso de epígrafe con la mayor celeridad posible para evitar que el proyecto en controversia se continúe dilatando y la controversia se torne académica.

**II.**

**A.**

Es norma firmemente establecida que los tribunales apelativos le deben conceder deferencia a las decisiones de las agencias administrativas. Lo anterior pues estas cuentan con experiencia y conocimiento especializado sobre asuntos ante su consideración. [15]

Como resultado, los dictámenes de una agencia administrativa gozan de presunción de legalidad y corrección.[16] Por lo tanto, las decisiones son respetadas mientras no se demuestre que dicha presunción de legalidad no sea superada o invalidada con evidencia suficiente.[17] En cuanto a las determinaciones de hecho que realiza una agencia, estas deben sostenerse si se fundamentan en evidencia sustancial que surja de la totalidad del expediente

---

[14] Ley Núm. 82-2010, 12 LPRA secs. 8121 *et seq.*

[15] *Capó Cruz v. Junta de Planificación,* 204 DPR 581, 591 (2020); *Torres Rivera v. Pol. de PR*, 196 DPR 606, 627 (2016).

[16] *Capó Cruz v. Junta de Planificación,* supra, pág. 591; *Torres Rivera v. Pol. de PR*, supra, pág. 627.

[17] *Batista, Nobbe v. JTA. Directores*, 185 DPR 206, 216 (2012).

administrativo.[18] Se ha definido la prueba sustancial como "aquella prueba relevante que 'una mente razonable podría aceptar como adecuada para sostener una conclusión'".[19] Este criterio busca "evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor".[20]

Por otro lado, las determinaciones de derecho pueden ser revisables en todos sus aspectos por los tribunales.[21] Nuevamente, la revisión judicial no debe servir para sustituir el criterio o la interpretación de la agencia administrativa de forma automática.[22] Los tribunales pueden descartar ese criterio, no obstante, cuando "no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo".[23] Por lo tanto, cuando un tribunal llega a un resultado diferente al de la agencia administrativa, éste debe determinar si la divergencia es a consecuencia de un ejercicio razonable y fundamentado de la discreción administrativa, ya sea por la pericia, por consideraciones de política pública o en la apreciación de la prueba.[24] En otras palabras, el criterio para seguir al momento de pasar juicio sobre la determinación del foro administrativo es la razonabilidad de la actuación de la agencia.[25]

Por lo tanto, la deferencia concedida a las agencias administrativas únicamente cederá cuando: (1) la determinación administrativa no esté basada en evidencia sustancial; (2) el organismo administrativo haya errado en la aplicación o

---

[18] *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Rolón Martínez v. Caldero López*, 201 DPR 26, 35-36 (2018).

[19] *Capó Cruz v. Junta de Planificación*, supra, pág. 591 (*citando a Rebollo v. Yiyi Motors*, 161 DPR 69, 76-77 (2004)).

[20] *Oficina de Ética Gubernamental v. Martínez Giraud*, 210 DPR 79, 90 (2022) (ci*tando a Torres Rivera v. Pol. de PR*, supra, pág. 627).

[21] Art. 4.5 de la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU), Ley Núm. 38 del 30 de junio de 2017, según enmendada, 3 LPRA sec. 9675; *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Torres Rivera v. Pol. de PR*, supra, pág. 626.

[22] *Capó Cruz v. Junta de Planificación*, supra, pág. 591; *Rebollo v. Yiyi Motors*, supra, pág. 77.

[23] *Rolón Martínez v. Caldero López*, supra, pág. 36.

[24] *Otero v. Toyota*, 163 DPR 716, 729 (2005).

[25] *Oficina de Ética Gubernamental v. Martínez Giraud*, supra, pág. 89; *Torres Rivera v. Pol. de Puerto Rico*, supra, pág. 626.

interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo actúe arbitraria, irrazonable o ilegalmente, al realizar determinaciones carentes de una base racional; o, (4) cuando la actuación administrativa lesione derechos constitucionales fundamentales.[26]

**B.**

Por otro lado, la *Ley de Política Pública Ambiental de Puerto Rico*, Ley Núm. 416 del 22 de septiembre de 2004 (Ley Núm. 416-2004), según enmendada, establece como política pública lograr un desarrollo sustentable en virtud de los siguientes cuatro objetivos: 1) la más efectiva protección del ambiente y los recursos naturales; 2) el uso más prudente y eficiente de los recursos naturales para beneficio de toda la ciudadanía; 3) un progreso social que reconozca las necesidades de todos; y 4) el logro y mantenimiento de altos y estables niveles de crecimiento económico y empleos.[27]

Igualmente, la *Ley de Política Pública Energética de Puerto Rico*, Ley Núm. 17 del 11 de abril de 2019 (Ley Núm. 17-2019), según enmendada, establece que el sistema eléctrico de Puerto Rico debe ser uno confiable y accesible, y existe en nuestra jurisdicción una política pública para reducir emisiones de gases de efecto invernadero y evitar otros efectos de cambio climático.[28] De hecho, nuestro gobierno acepta que para poder mejorar más todavía la calidad de vida de la ciudadanía y promover el desarrollo económico de la isla, "se necesitarán nuevas instalaciones de sistemas de energía solar y líneas eléctricas asociadas a dichas instalaciones de

---

[26] *Super Asphalt Pavement, Corp. v. Autoridad para el Financiamiento de la Insfraestructura de Puerto Rico*, 206 DPR 803, 819 (2021) (*citando a Torres Rivera v. Pol. de Puerto Rico*, supra, pág. 628).
[27] Art. 3 (C) de la Ley Núm. 416-2004, 12 LPRA sec. 8001.
[28] Ley Núm. 17-2019, 22 LPRA secs. 1141 *et seq.* (Exposición de Motivos); *Íd.*, sec. 1141d.

energía solar y aquella infraestructura eléctrica necesaria para la operación e interconexión segura del sistema fotovoltaico".[29]

A esos efectos, el Negociado de Energía de Puerto Rico (NEPR) es la entidad encargada de regular el mercado de energía en la isla contando con poderes, deberes, y recursos financieros y técnicos para asegurar el cumplimiento con la política pública energética.[30]

Por otro lado, la División de Evaluación de Cumplimiento Ambiental de la OGPe se encarga de obtener documentos ambientales con recomendaciones de las recomendaciones las agencias concernidas a cada proyecto para luego emitirle al Director Ejecutivo.[31] Dicha agencia también se encarga de evaluar, conceder o denegar determinaciones finales, permisos y cualquier trámite necesario o que incida de forma alguna en la operación del negocio en Puerto Rico.[32] En particular, la Junta Adjudicativa de la OGPe trabaja con celebrar vistas, evaluar y adjudicar solicitudes de carácter discrecional, entre otras funciones.[33]

Uno de los procedimientos discrecionales expuestos en el Reglamento Conjunto 2023 es la consulta de ubicación y terrenos.[34] Según el Artículo 1.5 (26) de la Ley Núm. 161-2009, el concepto "discrecional":

> [d]escribe una determinación que conlleva juicio subjetivo por parte de la Junta Adjudicativa, del Secretario Auxiliar o un Municipio Autónomo con Jerarquía de la I a la V sobre la forma en que se conduce o propone una actividad o acción. Éstos utilizan su conocimiento especializado, discreción y juicio para llegar a su determinación, ya que esta determinación considera otros asuntos además del uso de estándares fijos o medidas objetivas. El Secretario Auxiliar o el Municipio Autónomo con Jerarquía de la I a la V, puede utilizar juicios subjetivos discrecionales al decidir si

---

[29] Reglamento Conjunto 2023, supra, págs. 627-628.
[30] Art. 1.5 (3)(a) de la Ley Núm. 17-2019, supra, sec. 1141d.
[31] Art. 4 (B)(3) de la Ley Núm. 416-2004, supra, sec. 8001a.
[32] Arts. 2.1 & 2.5 de la *Ley para la Reforma del Proceso de Permisos de Puerto Rico*, Ley Núm. 161 del 1 de diciembre de 2009 (Ley Núm. 161-2009), según enmendada, 23 LPRA secs. 9012, 9012d.
[33] Art. 6.3 de la Ley Núm. 161-2009, *Íd.*, sec. 9016g.
[34] Sec. 2.2.3.1 del Reglamento Conjunto 2023, supra, pág. 44.

una actividad debe ser realizada o cómo debe realizarse.[35]

Asimismo, la consulta de ubicación es definida como aquel:

procedimiento ante la Oficina de Gerencia de Permisos o los Municipios Autónomos con Jerarquía de la I a la V, a los cuales se le haya delegado dicha facultad por medio del Convenio de Transferencia, para que evalúen, pasen juicio y tomen la determinación que estimen pertinente sobre propuestos usos de terrenos que no son permitidos ministerialmente y que no pueden considerarse mediante otro mecanismo. En áreas no calificadas incluye propuestos usos de terrenos que por su naturaleza y complejidad requieran un grado mayor de análisis.[36]

Precisamente, a través de una consulta de ubicación se toma una determinación final de carácter discrecional, que nunca podrá ser considerada como un permiso, sobre:

a. propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas calificadas, pero que las disposiciones reglamentarias o legales proveen para que sean consideradas por la Junta Adjudicativa de la OGPe o Municipio Autónomo con Jerarquía de la I a la V;

b. proyectos en los que se propone una densidad o intensidad mayor a la que permite el distrito en que ubica y no cumplen con el uso permitido en el distrito;

c. proyectos en los que se propone un desarrollo en un solar con mayor o menos cabida a la establecida y que no pueda considerarse mediante una variación en construcción;

d. propuestos usos de terrenos de carácter regional que estén en conformidad con las facultades que retiene la Junta de Planificación, bajo las disposiciones de la Ley Núm. 81, supra, y el Reglamento sobre los Planes de Ordenación Municipal y la Transferencia y Administración de Facultades (Reglamento de Planificación Núm. 24);

e. propuestos usos de terrenos que por su naturaleza o intensidad requieren una ubicación especial o particular para atender situaciones especiales, tales como proyectos industriales pesados como procesamiento de material de corteza terrestre, estaciones de trasbordo o de disposición final de desperdicios sólidos, entre otros, pero que en ningún caso se consideran proyectos suprarregionales;

---

[35] Art. 1.5 (26) de la Ley Núm. 161-2009, supra, sec. 9011.
[36] Art. 1.5 (14), *Íd.*, sec. 9011.

     f. propuestos usos de terrenos en áreas no calificadas que no han sido contemplados en los Reglamentos de Planificación; y

     g. toda mejora pública no inscrita en el Programa de Inversiones de Cuatro Años (PICA), excepto las transacciones públicas y aquéllas que se declaran exentas mediante resolución por la Junta de Planificación.[37]

Otra instancia en la cual se debe recurrir a un proceso de consulta de ubicación es cuando se trata de instalaciones solares fotovoltaicas, que serían instaladas sobre el terreno, y cuya capacidad sea mayor de un megavatio (1MV).[38]

En general, la determinación que se tome sobre una consulta de ubicación debe descansar en la evaluación de factores que presente y demuestre la parte interesada en el caso, incluyendo los siguientes factores:

    a. El proyecto deberá estar conforme con el Plan de Usos de Terrenos de Puerto Rico o el Plan de Ordenación Territorial Principio Rectores, Metas y Objetivos establecidos en el *Plan de Usos de Terrenos de Puerto Rico* aplicables a municipios que no cuenten con un Plan Territorial aprobado.

    b. Que exista o se pueda proveer la infraestructura necesaria para atender las necesidades del proyecto propuesto y para mitigar sus efectos directos e indirectos.

    c. La viabilidad, aceptabilidad y conveniencia del uso propuesto.

    d. La cabida del predio deberá exceder el máximo permitido para un cambio de calificación directo.

    e. Cómo se atienden las necesidades de la comunidad donde ubica el proyecto propuesto y cómo el mismo responde al interés público.[39]

## C.

Por otra parte, los terrenos clasificados como Suelo Rústico Protegido Agrícola (SREP-A) bajo el Plan de Uso de Terrenos (PUT) son equivalentes a la clasificación de distrito Agrícola-Productivo (A-P), anteriormente clasificada como Agrícola Mecanizable (A-1).[40] En particular, los terrenos A-P son:

---

[37] Reglamento Conjunto 2023, supra, pág. 806.
[38] Sec. 9.4.1.3 (2), *Íd.*, pág. 628.
[39] Sec. 2.2.3.3, *Íd.*, pág. 45.
[40] Plan de Uso, supra, pág. 124.

no urbanos ni desarrollados, llanos o semillanos, mecanizables, con Instalaciones de riego o disponibilidad para ello, o que por su condición natural no requiera riego; además incluye aquellos que puedan mejorarse de forma tal que los hagan aptos para uso agrícola productivo y con capacidad agrícola de las Clases I al IV, según el catastro de suelos.[41]

Además, están "compuesto[s] por terrenos cuya continuidad en uso agrícola se declara de importancia para la Isla, y que pueden encontrarse en inactividad agrícola, sin que ello menoscabe su alto potencial agropecuario".[42] Uno de los usos permitidos de este tipo de terreno son los proyectos de energía renovable.[43]

**D.**

Según descrito anteriormente, la OGPe se encarga de obtener documentos ambientales con recomendaciones de las agencias concernidas a cada proyecto para luego emitirle las recomendaciones al Director Ejecutivo.

La determinación de cumplimiento ambiental es la que realiza el Director de la OGPe o la Junta Adjudicativa de dicha entidad administrativa, como parte de una decisión final, por la cual certifica que la Agencia Proponente cumplió con los requisitos sustantivos y procesales del Artículo 4(B)(3) de la Ley Núm. 416-2004 y con los reglamentos aplicables;[44] a saber:

> **3.** Incluir en toda recomendación o informe sobre una propuesta de legislación y emitir, antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medioambiente, una declaración escrita y detallada sobre:
>> **a)** El impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;
>> **b)** cualesquiera efectos adversos al medioambiente que no podrán evitarse si se aprobase y aplicase la propuesta legislación, si se efectuase la acción o promulgase la decisión gubernamental de que se trate[;]

---

[41] *Íd.*, págs. 124-125.
[42] Sección 6.1.19.1 (a) del Reglamento Conjunto 2023, supra, pág. 437.
[43] *Íd.*, págs. 437-438; Resolución Núm. JPI-41-01-2023, Apéndice de la oposición al recurso presentado por Clean Flexible Energy, págs. 423-425.
[44] Reglamento Conjunto 2023, supra, pág. 813.

**c)** alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión;
**d)** la relación entre usos locales a corto plazo del medioambiente y la conservación y mejoramiento de la productividad a largo plazo; y,
**e)** cualquier compromiso irrevocable o irreparable de los recursos naturales que estarían envueltos en la legislación propuesta, si la misma se implementase; en la acción gubernamental, si se efectuase; o en la decisión, si se promulgase.[45]

Por otra parte, la declaración de impacto ambiental (DIA) es un documento ambiental presentado ante la OGPe, quien se debe encargar de referir dicho documento a la División de Cumplimiento Ambiental de dicha entidad gubernamental cuando se ha determinado que la acción propuesta conllevaría un impacto significativo sobre el ambiente, según definido por el Reglamento Conjunto 2023.[46] Asimismo, el impacto ambiental significativo es aquel efecto sustancial de una acción propuesta sobre uno o varios elementos del ambiente incluyendo un recurso natural o la calidad de vida; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo a favor de los usos a corto plazo o viceversa.[47]

Particularmente, la División de Evaluación de Cumplimiento Ambiental (DECA) debe evaluar la DIA, en virtud de los criterios que se disponen en el *Reglamento para el Proceso de Evaluación Ambiental,* Reglamento Núm. 8858, Junta de Calidad Ambiental, págs. 28-29, y remitirle a la Junta Adjudicativa de la OGPe sus recomendaciones dentro de un término que no exceda de sesenta (60) días contados desde la fecha de radicación de la solicitud.[48] Luego de ello, la Junta Adjudicativa debe realizar la determinación de cumplimiento ambiental, la cual será considerada un componente de la determinación final sobre la acción propuesta.[49]

---

[45] Art. 4 (B) (3) de la Ley Núm. 416-2004, supra, sec. 8001a.
[46] Reglamento Conjunto 2023, supra, pág. 810.
[47] *Íd.*, pág. 832.
[48] Sec. 2.6.5.3, *Íd.*, pág. 78.
[49] *Íd.*

**III.**

En el presente caso, el Comité Ambiental solicita que revoquemos la *Resolución* recurrida, pues arguye que la Junta Adjudicativa de la OGPe erró al concluir que el Reglamento Conjunto 2023 contempla el uso de placas solares sobre el terreno propuesto, al no considerar el alegado impacto del proyecto de energía renovable de Clean Flexible Energy sobre los terrenos agrícola y las comunidades cercanas, e incidió al no exigir una declaración de impacto ambiental.

Con relación al primer y segundo señalamiento de error, el Comité Ambiental alegó que la Junta Adjudicativa de la OGPe erró al aprobar la consulta de ubicación a pesar de que la instalación de placas solares es incompatible con la clasificación del terreno propuesto como SREP-A, según dispuesto por el Plan de Uso de Terrenos o A-P, en virtud del Mapa de Calificación de Suelos del Municipio de Salinas; y al supuestamente no considerar el impacto del terreno y la comunidad vecina. No tiene razón.

Según dispuesto anteriormente, los terrenos con clasificación SREP-A o A-P, previamente clasificados como A-1, tienen continuidad de uso agrícola de importancia para la isla e incluso se pueden encontrar en inactividad agrícola, sin que ello menoscabe su alto potencial agropecuario; es decir, agricultura y ganado. Uno de los usos permisibles sobre este terreno son los proyectos de energía renovable, lo cual es cónsono con la política pública de establecer un sistema eléctrico confiable y accesible, y de disminuir los impactos de cambio climático.

Sin embargo, cuando se trata de instalaciones solares fotovoltaicas, que sean instaladas sobre el terreno, y cuya capacidad sea mayor de un megavatio (1MV), se debe recurrir al procedimiento de una consulta de ubicación. Este procedimiento es discrecional por lo que conlleva un juicio subjetivo por parte de la Junta

Adjudicativa de la OGPe o Municipios Autónomos con Jerarquía de la I a la V. Los criterios que deben tomar para alcanzar una determinación sobre una consulta de ubicación son que 1) el proyecto debe ser conforme al Plan de Usos de Terrenos o el Plan de Ordenación Territorial Principio Rectores, Metas y Objetivos; 2) que exista o se pueda proveer la infraestructura necesaria para atender las necesidades del proyecto propuesto y para mitigar sus efectos directos e indirectos; 3) la viabilidad, aceptabilidad y conveniencia del uso propuesto; 4) la cabida del predio debe exceder el máximo permitido para un cambio de calificación directo; y 5) cómo se atienden las necesidades de la comunidad donde ubica el proyecto propuesto y cómo el mismo responde al interés público.

Del expediente del caso de epígrafe se desprende que el Oficial Examinador de la OGPe determinó que el proyecto cumplió favorablemente con todos los criterios anteriormente establecidos.

Respecto al primer requisito sostuvo que el uso propuesto de desarrollar el proyecto de energía renovable en el terreno es permisible en los terrenos con clasificación A-P; la instalación de paneles solares sobre dicho terreno no representa un daño irreversible a los terrenos agrícolas; y el proyecto viabiliza el uso dual de agricultura y ganado.

Asimismo, durante dicha vista celebrada el 19 de abril de 2024, el ingeniero y proyectista Pedro M. García Campos testificó que el proyecto propuesto "viabiliza el uso dual de la propiedad para el desarrollo de propuestas agrícolas, toda vez que es posible armonizar la producción de energía renovable con usos agrícolas".[50] Enfatizó también que el análisis de potencial agrícola reflejó que los suelos encontrados en el predio propuesto favorecen las actividades de pastoreo, promoviendo así el uso agropecuario en el predio a

---

[50] *Informe de Vista Pública*, Apéndice de recurso, pág. 247.

través de ganado ovino.[51] **Cónsono con lo anterior, el Oficial Examinador determinó que, dicho predio no está localizado dentro de una reserva agrícola delimitada,[52] y que conforme al documento ambiental aprobado, "los terrenos evaluados evidencia[ron] haber sido <u>perturbados</u> y utilizados para usos agrícolas y <u>poseen una baja biodiversidad</u>"**.[53] Incluso como parte del análisis de potencial agrícola realizado por el Servicio de Conservación de Recursos Naturales del Departamento de Agricultura Federal, el predio en cuestión cae dentro de la Asociación Jacana-Amelia Fraternidad, y **los suelos bajo esta asociación "tienen limitaciones para uso agrícola por su pendiente moderada, susceptibilidad a la erosión, poca precipitación, y un alto potencial de contracción y expansión"**.[54]

Respecto al segundo, tercer y cuarto requerimiento, el Oficial Examinador de la OGPe resolvió que la infraestructura necesaria para atender las necesidades del proyecto existe o se puede proveer; el uso del proyecto propuesto no solo es viable, aceptable y conveniente, sino que **no tendrá <u>impactos significativos</u> al medioambiente, recursos culturales, recursos naturales protegidos; consideró las medidas de mitigación necesarias para su implementación**; y que el proyecto no requiere cambio de calificación.

En cuanto al último y quinto factor, se desprende del informe de la vista pública que el proyecto en cuestión propone acciones que atienden necesidades de la comunidad donde ubica el mismo y de todo Puerto Rico ya que es en respuesta a la necesidad de crear un sistema eléctrico resiliente y robusto para la Isla. Resolvió el Oficial

---

[51] *Íd.*, pág. 260.
[52] *Íd.*
[53] *Íd.*, pág. 243 (Énfasis y subrayado suplido).
[54] *Íd.*, pág. 260 (Énfasis suplido).

Examinador que el uso propuesto es uno contemplado en el Reglamento Conjunto 2023 y que "la preocupación sobre al [sic] alegada posibilidad de inundabilidad fue atendida como parte de los propuestos la cual se deberá concretar a través del permiso de construcción que en su día se emita para la realización del proyecto presentado".[55]

En resumen, el Oficial Examinador determinó que el predio propuesto para el despliegue del sistema fotovoltaico no está siendo utilizado para un uso productivo por el dueño, y que el uso propuesto es cónsono con la política pública energética que tiene como eje la diversificación de fuentes de energía renovable y promover el desarrollo económico de la Isla, al igual que la política pública ambiental y de uso de terrenos. Por lo tanto, la Junta Adjudicativa de la OGPe no erró al aprobar la consulta de ubicación.

Respecto al tercer señalamiento de error, el Comité Ambiental alegó que la Junta Adjudicativa de OGPe erró al no exigir la presentación de una declaración de impacto ambiental. No obstante, no le asiste razón.

Como se expuso en la sección anterior, la determinación de cumplimiento ambiental es la que realiza el Director de la OGPe o la Junta Adjudicativa de dicha entidad administrativa, como parte de una decisión final, por la cual certifica que la Agencia Proponente cumplió con los requisitos sustantivos y procesales del Artículo 4(B)(3) de la Ley Núm. 416-2004.[56] Conforme a los requisitos que debe evaluar la OGPe para la determinación de cumplimiento ambiental, previo a efectuar cualquier acción o decisión gubernamental que afecte significativamente la calidad del medioambiente, se encuentra emitir una declaración escrita y detallada sobre 1) el impacto ambiental de la acción a efectuarse o

---

[55] *Íd.*, pág. 262.
[56] Art. 4 (B) (3) de la Ley Núm. 416-2004, supra, sec. 8001a.

la decisión a promulgarse; 2) cualesquiera efectos adversos al medioambiente que no podrán evitarse; 3) alternativas a la acción o decisión gubernamental en cuestión; 4) la relación entre usos locales a corto plazo del medioambiente y la conservación y mejoramiento de la productividad a largo plazo; y 5) cualquier compromiso irrevocable o irreparable de los recursos naturales que estarían envueltos.

Por otra parte, la declaración de impacto ambiental es un documento ambiental presentado ante la OGPe, quien se debe encargar de referir dicho documento a la División de Cumplimiento Ambiental de dicha entidad gubernamental **cuando se ha determinado que acción propuesta debe conllevar un impacto significativo sobre el ambiente**. A esos efectos, el impacto ambiental significativo es aquel efecto sustancial de una acción propuesta sobre uno o varios elementos del ambiente incluyendo un recurso natural o la calidad de vida; o que pueda sacrificar los usos beneficiosos del ambiente a largo plazo a favor de los usos a corto plazo o viceversa.

Según se desprende del expediente del caso de epígrafe, la División de Cumplimiento Ambiental de la OGPe emitió una determinación de cumplimiento ambiental el 20 de febrero de 2024 para Evaluación Ambiental bajo el caso número 2023-507196-DEA-013159 mediante la cual aprobó el documento de evaluación ambiental del proyecto de Clean Flexible Energy. Además, el Oficial Examinador resolvió que el proyecto propuesto por Clean Flexible Energy no tendrá un impacto significativo sobre los recursos naturales ni a los culturales; asunto que debe estar presente para que se le refiera la declaración de impacto ambiental a la División de Cumplimiento Ambiental de la OGPe.

Adviértase también que con el proyecto propuesto se estaría utilizando un predio en desuso y que no constituye reserva agrícola

para el desarrollo de un proyecto de energía y para funciones agropecuarias; es decir, usos que son permitidos por terrenos clasificados como A-P. Es decir, el proyecto viabilizaría el uso del terreno en cuestión aun cuando el predio ya había sido perturbado y actualmente posee limitaciones para uso agrícola por su pendiente moderada, susceptibilidad a la erosión, poca precipitación, y un alto potencial de contracción y expansión. Además, el Departamento de Agricultura expresó que era necesario establecer fuentes alternas de energía debido a las fluctuaciones inestables del sistema energético de la zona sur de Puerto Rico. Por lo tanto, OGPe no erró al no requerir una declaración de impacto ambiental.

A la luz de lo expuesto, concluimos que el Comité Ambiental no logró rebatir las determinaciones de hechos y conclusiones de derecho del Oficial Examinador, las cuales fueron acogidas e incorporadas por la Junta Adjudicativa de la OGPe mediante la *Resolución* recurrida. Por lo ende, la Junta Adjudicativa de la OGPe no cometió los errores señalados por el Comité Ambiental, el dictamen recurrido es correcto en derecho y, consecuentemente, corresponde confirmar la *Resolución* recurrida.

**IV.**

En virtud de lo anterior, confirmamos la *Resolución* recurrida.

**Notifíquese.**

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones